UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| CHARLESETTA BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 22-167-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Plaintiff Charlesetta Barnes appeals the Acting Commissioner of Social Security's denial of her claim for supplemental security income. She contends that the ALJ assigned to her case failed to properly consider her obesity and ability to sustain attention. Upon review of the record and the parties' arguments, however, the Court finds that the ALJ's decision is based upon substantial evidence and correctly-applied rules of law. As a result, the Acting Commissioner's decision will be affirmed.

**I.**

Barnes filed her current application for supplemental security income ("SSI") on May 3, 2016.[1] [Administrative Transcript, hereafter, "Tr." 318-27] The claim was denied initially on February 9, 2017, and upon reconsideration on June 5, 2017. [Tr. 189, 196] ALJ Robert Bowling held administrative hearings in 2019 and 2021 and issued a written opinion denying benefits on January 26, 2021. [Tr. 39-105] The Appeals Council denied Barnes' request for

---

[1]    Barnes previously filed a claim for SSI on January 28, 2012, but that claim was denied by ALJ Roger Reynolds on May 15, 2014. [Tr. 109-121]

review on April 5, 2022, making this matter ripe for judicial review.  *See* Tr. 1-3; 42 U.S.C. §
405(g).

## II.

Barnes was 54 years old at the time of the ALJ's decision.  She alleged that she became
unable to work on January 1, 2002.  At the time of her application, she reported being unable
to work due to congestive heart failure, sarcoidosis, asthma, chronic back pain, spondylosis
spurs, high cholesterol, anxiety, and acid reflux.  [Tr. 349]  Barnes reported being five feet,
five inches tall and weighing 220 pounds.  *Id.*

Barnes is a high school graduate and has completed cosmetology school.  Despite her
alleged onset date, Barnes' application for benefits indicates that she worked full time as a
self-employed hairdresser until 2012.  She also reported that she worked part time as a
breakfast attendant and laundry attendant at a hotel in 2006 and 2007.  At times relevant to this
action, Barnes resided with two grandchildren and her sister.  [Tr. 88]  She had a driver's
license and drove a car every day.  [Tr. 89]

The administrative record indicates that for several years Barnes received treatment for
low back pain.  [Tr. 468]  An x-ray taken in October 2014 exhibited small osteophytes that
were unchanged since a prior study, as well as mild disc space narrowing at L5-S1.  [Tr. 747]
Primary care provider Alina Rizea, M.D., referred Barnes to a pain management specialist in
November 2016.  [Tr. 522]  Barnes reported moderate pain relief with narcotics and epidural
steroid injections.  [Tr. 996]  As of September 10, 2020, Barnes' pain management doctor
observed her to have a normal and fluid gait, normal stance, no limp, and ambulation without
an assistive device.  [Tr. 1003]  An updated lumbar MRI in January 2020 showed mild to
moderate multilevel spondylotic disease that appeared worst at the L4-L5 level and had

- 2 -

progressed since previous imaging.  However, there was no evidence of high grade spinal canal or neural foraminal stenosis.  [Tr. 992]   Motor strength in Barnes' lower extremities was good although her lumbar range of motion was somewhat limited due to pain.  [*See* Tr. 1019.] Barnes also sought chiropractic treatment for her back pain in 2020, but it appears that she attended only a few sessions.  [Tr. 1041-66]

Barnes also sought treatment for ongoing neck and shoulder pain.  A December 2013 shoulder scan revealed moderate osteoarthritic changes in her right glenohumeral and acromioclavicular joints.   [Tr. 751]   She received an anti-inflammatory injection in that shoulder and was instructed to participate in physical therapy.  Then, in January 2014, Barnes underwent a right carpal tunnel release and received a steroid injection to the left carpal tunnel. [Tr. 941]

Barnes was seen at the University of Kentucky Orthopedic clinic for right shoulder pain in February 2015.  [Tr. 641]  The examining physician noted that Barnes' strength was within normal limits and believed that the problem was trapezius pain.  Barnes was given a referral to physical therapy.  She received an EMG exam in October 2015 due to continued complaints of bilateral upper extremity paresthesia and neck pain.  [Tr. 737] This testing revealed evidence of bilateral residual median nerve neuropathy at the wrist which was essentially unchanged from a study performed in June 2012.  Findings were not consistent with worsening or recurrent median neuropathy at the wrist.  [Tr. 739]

Barnes returned to the University of Kentucky Orthopedic Clinic in August 2018.  At that time, she was unable to raise her right arm above 90 degrees.  [Tr. 653]  An x-ray performed the same day revealed moderate glenohumeral osteoarthritis in her right shoulder.

[Tr. 879] Barnes underwent breast reduction surgery in November 2019, which reportedly reduced her neck and upper back pain. [Tr. 1018]

Barnes was diagnosed with stage I or stage II sarcoidosis around 2012. [Tr. 905, 913, 943] A chest scan performed in 2013 showed sequela of prior granulomatous disease without focal consolidation, pleural effusion, or pneumothorax, and no acute cardiopulmonary process. [Tr. 752] The record includes a pulmonary function report from 2014 stating that Barnes walked 1,496 feet and no significant desaturation was noted with ambulation. [Tr. 750] Additionally, there was no airway obstruction and no restriction by total lung capacity, but Barnes' diffusion capacity was moderately reduced. Compared to a 2012 study, there was a 340 mL decrease in FEV1 and a 400 mL decrease in the FVC; however, total lung capacity was unchanged and the DLCO had improved. A treatment note from August 2016 indicates that Barnes was not being treated for sarcoidosis but previousle had taken corticosteroids for flares. Barnes underwent a sleep study in September 2016 and was diagnosed with mild sleep apnea. [Tr. 502] She was prescribed a CPAP machine in light of her sleepiness and self-reported congestive heart failure.

Barnes has received treatment for cardiology issues, as well. She was admitted to the University of Kentucky Medical Center in June 2013 due to complaints of increased premature ventricular contractions. [Tr. 891, 767] Although she did not have chest pain or shortness of breath, the attending physician noted that Barnes had "known severe hypertension." It appears she was prescribed Toprol XL and discharged the next day. An ECG in October 2013 was normal. [Tr. 768] In September 2016, she had a "borderline ECG" and possible left atrial enlargement. A venous duplex study of the lower extremities was abnormal in September 2016, indicating some venous valvular insufficiency bilaterally. [Tr. 781]

- 4 -

In June 2016, Barns had laparoscopic bilateral salpingo-oophorectomy and extensive lysis of adhesions due to chronic pelvic pain. [Tr. 461] She underwent a surgical panniculectomy on July 26, 2017. [Tr. 574] This procedure removed an overhanging pannus, which caused Barnes pain and other symptoms, as well as interference in her activities of daily living. [Tr. 581] The record also indicates that lap band surgery was performed January 2020. [Tr. 1012-14]

Barnes reported in her application for benefits that she did not handle stress well, that she had memory problems and difficulty getting along with others, and that she had three distinct personalities. [Tr. 372] She reported having been hospitalized for psychosis in 2001 following a legal dispute. She took Prozac for depression and buspirone for anxiety. [Tr. 511]

Consultant Cristi Hundley, Ph.D. performed a mental status evaluation on January 3, 2017. [Tr. 510-12] Barnes' speech was coherent and relevant during the evaluation and Hundley described her as alert, pleasant, and cooperative. She did not exhibit any psychotic symptoms and denied any suicidal or homicidal ideations. Barnes was able to recall matters within her immediate, recent, and remote memory. She advised Hundley that she started noticing the three personalities around 2000. There were no supportive documents to verify or expand of her reported mental health history.

Hundley concluded that Barnes' ability to understand and remember simple instructions was mildly limited and her ability to maintain attention and concentration was fair. She further determined that Barnes' ability to interact appropriately in a work setting was moderately limited and her ability to handle typical job stresses was moderately to markedly limited "given her description." Hundley concluded that a physician would need to comment

further on her specific medical conditions, her prognosis, and any limitations her conditions would have on her ability to work.  [Tr. 512]

Agency consultant Dan Vandivier, Ph.D. reviewed Barnes' record on February 5, 2017.  [Tr. 142]  He believed that her ability to understand, remember, and carry out detailed instructions was moderately limited.  [Tr. 140-41]  Additionally, Vandivier indicated Barnes' ability to interact appropriately with the public and to respond to changes in the work setting would be moderately limited.  He believed she could understand and remember simple instructions and procedures with short initial learning periods.

Consultant Lea Perritt, Ph.D., reviewed the file on reconsideration on June 5, 2017.  [Tr. 156]  She noted that, while Barnes "manifest[ed] anxiety and personality problems," there was a lack of credible support for a clear psychotic disorder.  Further, the record indicated that Barnes had adequate focus and interactions with others.  Ultimately, Perritt concluded that Barnes' allegations were partially consistent with the objective signs and findings, which portrayed less intensity and extent than she alleged.

On June 5, 2017, agency consultant Donna Sadler, M.D., reviewed Barnes' record for purposes of evaluating her physical RFC.  [Tr. 160]  She concluded that Barnes' RFC had not changed significantly since her prior disability determination in 2014.  More specifically, she found that Barnes could frequently lift and/or carry 10 pounds and occasionally lift and/or carry 20 pounds.  [Tr. 157-58]  Sadler reported that Barnes could sit or stand and/or walk for about six hours in an eight-hour workday.  She could occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ramps, stairs, ropes, and scaffolds.  Sadler also observed that Barnes had a limited ability to perform work with her hands over her head.

William Biles, M.D. provided a medical statement after reviewing Barnes' records on September 27, 2020.   [Tr. 965-85]   Biles opined that Barnes had the severe medical impairments of sarcoidosis, congestive heart failure, and chronic back pain.   However, he pointed to specific medical evidence from the record to explain why the conditions were not severe enough to meet or equal an impairment described in the Listing of Impairments.   [Tr. 977-78]

With respect to physical activity, Biles reported that Barnes would be able to lift or carry 10 pounds frequently and 20 pounds occasionally.   He believed she should never lift or carry over 20 pounds.   Biles further indicated that Barnes could sit for four hours; stand for two hours; and walk for one hour at a time without interruption.   He believed she could sit for six hours; stand for four hours; and walk for a total of two hours in an eight-hour workday. Biles noted that she could use her hands and feet frequently.   [Tr. 982]   He stated that she should never climb ladders or scaffolds, but could frequently climb stairs and ramps and could frequently balance, stoop, kneel, crouch, and crawl.   Biles reported that Barnes should never be exposed to unprotected heights but could frequently be exposed to vibrations, moving mechanical parts, and could operate a motor vehicle.   He also believed she could occasionally be exposed to humidity and wetness; dust, odors, and pulmonary irritants, extreme cold, and extreme heat.

After considering the entire record, the ALJ found that Barnes had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) except she could

> occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; can sit for 6 hours in an 8-hour workday with normal breaks; can stand for 4 hours in an 8-hour workday with normal breaks; can walk for 2 hours in an 8-hour

workday but for no more than one hour at a time; can push or pull equal to the claimant's lift and carry amounts; can never climb ladders, ropes and scaffolds; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch and crawl; can frequently reach in all directions with the bilateral upper extremities; can frequently operate foot controls with the bilateral lower extremities; should avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity and environmental irritants such as fumes, odors, dusts, gases, poorly ventilated areas and chemicals; should avoid even moderate exposure to hazards such as the use of moving machinery, operating a motor vehicle, vibrations and to unprotected heights; work is limited to tasks performed in a work environment free of fast-paced production requirements involving simple, routine and repetitive tasks, with only occasional work place changes; should have only occasional interaction with the general public, only occasional interaction with co-workers and only occasional supervision.

Vocational expert Jackie Rogers was present during Barnes' administrative hearing and, when presented with the RFC, testified that Barnes would be unable to perform her past work. However, he stated that jobs exist in the national economy for an individual with this RFC who is Barnes' age and has her education and work experience. Based on Rogers' testimony, the ALJ concluded that Barnes was capable of making a successful adjustment to other work and, therefore, was not disabled. [Tr. 49]

### III.

Under the Social Security Act, a "disability" is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)). A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 20 C.F.R. § 404.1520(a)(4)). If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step. *See Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that she is not engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 416.920(c). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination of the disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether she can perform his past work. 20 C.F.R. § 416.920(e). If she can, she is not disabled. 20 C.F.R. § 416.920(f).

Under the fifth step of the analysis, if the claimant's impairments prevent her from doing past work, the Commissioner will consider her RFC, age, education, and past work experience to determine whether he can perform other work. If she cannot perform other work, the Commissioner will find the claimant disabled. 20 C.F.R. § 416.920(g). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'" *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

This Court's review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ employed the proper legal standards in reaching her decision. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial

evidence is such relevant evidence as reasonable minds might accept as sufficient to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g).

## IV.

### A.    The ALJ's Assessment of Barnes' Obesity

Barnes contends that the ALJ erred by deeming her obesity a non-severe impairment and by failing to consider the limitations it caused when formulating the RFC. It is well settled that an ALJ's failure to identify an impairment as "severe" is harmless as long as the ALJ continues the disability determination and considers severe and non-severe impairments during the subsequent steps of the evaluation required under the regulations. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). Barnes contends that although she was morbidly obese throughout the relevant period, the ALJ did not consider this impairment as required under Social Security Ruling 19-02p.

Social Security Ruling 19-02 requires an ALJ to "consider the limiting effects of obesity when assessing a person's RFC." 2019 WL 261798, at *4. The Ruling acknowledges that "the combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately" and requires the ALJ to "explain how [he] reached [his] conclusion on whether obesity causes any limitations." *Id.* But when a plaintiff disagrees that an ALJ's analysis regarding obesity is inadequate, she must meet the "burden of showing specifically how [her] obesity, in combination with [her] other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC." *Montagna v.*

- 10 -

*Kijakazi*, 2022 WL 565601, at *3 (W.D. Tenn. Feb. 24, 2022) (quoting *Lumpkin v. Comm'r of Soc. Sec.*, 2021 WL 5828692, at *7 (N.D. Ohio Oct. 6, 2021)).

Barnes has not identified any particular aspect of her ability to function that is limited by her obesity that is not accounted for in the RFC.  The Court also notes that Barnes' body mass index ("BMI") has steadily declined throughout the relevant period.  At the time of the ALJ's January 2021 hearing, Barnes' BMI was still in the obese range, but was closely approaching the overweight range.  Additionally, Barnes underwent an abdominal panniculectomy in 2017 to remove excess tissue that was limiting her ability to function.  She simply has not explained how the RFC should have been limited further to accommodate her obesity.

## B.    Barnes' Ability to Sustain Attention

Consultants Vandivier and Perritt both reported that Barnes could "sustain attention, consistent effort and pace for simple tasks requiring little independent judgment and involving minimal variations, and doing so for extended periods of two-hour segments without unreasonable number or length of rest periods, while maintaining regular attendance and being punctual with customary tolerances."  [Tr. 142, 162] But Barnes contends that the ALJ erred by giving "some weight" to these opinions while failing to incorporate the two-hour limitation or explaining why it was not included.

The Commissioner points out in her motion that the RFC describes "unskilled work," which only requires the ability to pay attention in two-hour segments.  *See* Social Security Administration Program Operations Manual System ("POMS") DI 25020.010, 2001 WL 1933437 (updated Aug. 23, 2018).  Barnes correctly notes that POMS guidelines are not subject to formal rulemaking procedures and, therefore, do not have the force of law.  *See*

- 11 -

*Paxton v. Comm'r of Soc. Sec.*, 2020 WL 3026233, at *8 (S.D. Ohio June 5, 2020) (citing *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989)). *But see Holland v. Astrue*, 2012 WL 4498820, at *4 (E.D. Ky. Sept. 28, 2012) (observing that POMS may be persuasive authority). Regardless, ALJs are not required to "adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 276 (6th Cir. 2015). This is true even when the ALJ affords the opinion "great weight." *Id.* The ALJ determined that Barnes could only work in an environment free of fast-paced production requirements involving simple, routine, and repetitive tasks, with normal breaks. However, he did not explicitly include a restriction requiring two-hour segments.

The Court is not persuaded by Barnes' reliance on *Ryan v. Commissioner of Social Security*, 307 F. Supp. 3d 797, 804 (S.D. Ohio 2017), in which the district court found the ALJ's treatment of the plaintiff's treating physician's opinion to be reversible error under somewhat similar facts. There, the court found that the ALJ had erred when he gave the doctor's opinion "some weight" and then did not make clear which portion was credited and which portion was not. It stated that the ALJ exacerbated the issue by failing to analyze whether the doctor's opinion should have been given controlling weight under the then-prevailing "treating source rule." *Id. See also* 20 C.F.R. § 416.927(c)(2). Unlike the ALJ in *Ryan*, the ALJ in this case was not required to give special consideration to any particular source. *See* 20 C.F.R. § 416.920c.

In explaining Barnes' mental functioning, the ALJ noted that Barnes worked periodically throughout the period under consideration. Barnes was consistently oriented to time, person, and place and her memory was routinely observed to be intact. Healthcare

- 12 -

providers described her as alert, pleasant, and cooperative throughout the record. She recalled her medical history and answered questions posed to her without difficulty. [Tr. 43] Additionally, he cited Barnes' hearing testimony that she watched television and played games on her phone. *See Cook v. Comm'r of Soc. Sec.*, 2020 WL 7253307, at *10 (S.D. Ohio Dec. 10, 2020) (observing that an ALJ may rely on his own observations, as long as other substantial evidence in the record supports his conclusions). While the ALJ did not adopt every limitation Vandivier and Perritt assessed, he gave sufficient reasons determining the mental limitations in the RFC.

### C.    Substantial Evidence Supports the ALJ's Decision

The physical portion of the RFC is supported extensively by the opinions of Biles and Sadler. And the psychological portions of the RFC are supported by the opinions of Vandivier, Perritt, and Hundley, as well as the ALJ's own observations during the two hearings. Barnes' treatment records across the consideration period also support the ALJ's conclusion that she can perform light work with limitations. Although Barnes suffers from a variety of health issues, the objective findings appear to have been relatively mild. She underwent surgeries, including a panniculectomy, breast reduction, hernia repair, nasal surgery, and laparoscopic bilateral salpingo-oophorectomy, but her treatment for orthopedic, cardiac, and pulmonary issues was conservative. She reported driving every day and being able to go shopping and perform household chores. Although she reportedly had some issues with depression, anxiety, and difficulty concentrating, she engaged with the ALJ and was able to answer all questions without difficulty.

It is well established that agency consultative medical and psychological opinions may constitute substantial evidence supporting an ALJ's decision. *See Brock v. Astrue*, 2009 WL

1067313, at *6 (E.D. Ky. Apr. 17, 2009).  This is particularly the case where, as here, there is other substantial evidence in the record to support those opinions.

V.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Plaintiff Charlesetta Barnes' motion for judgment on the pleadings [Record No. 13] is **DENIED**.

2.      Defendant Acting Commissioner of Social Security Kilolo Kijakazi's motion for summary judgment [Record No. 15] is **GRANTED**.

Dated: December 2, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky